UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SPRINGFIELD SCHOOL COMMITTEE,<br><br>    Plaintiff,<br><br>v.<br><br>QUETZAL DOE, By and Though his Educational Surrogate Parent BRYAN CLAUSON, ESQ., THE MASSACHUSETTS DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION and THE BUREAU OF SPECIAL EDUCATION APPEALS,<br><br>    Defendants. | CIVIL ACTION NO. 08-30132-MAP |

**MEMORANDUM IN SUPPORT OF
STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendants the Massachusetts Department of Elementary and Secondary Education and the Bureau of Special Education Appeals ("BSEA") (collectively, the "state defendants") submit this memorandum in support of their cross-motion, pursuant to FED. R. CIV. P. 56(b) and LR. 56.1, for summary judgment in their favor (Dkt. No. 28) and in opposition to the cross-motion for summary judgment (Dkt. No. 25) filed by plaintiff Springfield School Committee ("Springfield"). For the reasons set forth below, this Court should deny Springfield's motion, allow the state defendants' motion, and enter judgment in their favor, affirming the decision of the BSEA under review. *Administrative Record (Volume I of II)* (Dkt. No. 20) at 203-214.[1]

---

[1] The record of the proceedings before the BSEA was filed with the Court in two

## I. INTRODUCTION

Hearing Officer Lindsay Byrne did not err in concluding that Quetzal Doe's ("Quetzal's") repeated absences – in excess of thirty between September 2007 and January 2008 – from school obligated Springfield to take affirmative action and that Springfield's failure to take any action to address Quetzal's absenteeism resulted in a denial of a free, appropriate public education ("FAPE"). The Hearing Officer also did not err in ordering compensatory services as a result of this denial of FAPE. Accordingly, the decision should be affirmed.[2]

## II. FACTUAL BACKGROUND

The following facts were found by the Hearing Officer:[3]

1. Quetzal was initially found eligible for special education on February 13, 2007, when he was in the 8th grade. A psychological evaluation conducted by the Springfield Public Schools found Quetzal to have impaired cognitive functioning. Teacher reports highlighted Quetzal's difficulties with attention, concentration, lack of background information, and overall poor academic skills. The Team noted that Quetzal demonstrated significant and persistent behavioral and discipline issues. He was inappropriate and disruptive in all school settings. He also had a history of poor school attendance. (P-5; P-6; P-7; P-4)

2. The Team developed an IEP calling for Quetzal to receive intensive, specialized instruction in math and English language, as well as academic support, in a substantially separate classroom program. It also provided for special education assistance in all other school settings;

---

volumes, the pages of which are consecutively numbered. *Administrative Record (Volume I of II)* (Dkt. No. 20) (containing pages 1-231); *Administrative Record (Volume II of II)* (Dkt. No. 21) (containing pages 232-440). References to the record will be designated as R 1 at ____ and R 2 at ____.

[2] The state defendants take no position on Springfield's arguments concerning its liability to Quetzal for attorney's fees. Dkt. No. 24 (Springfield's Memorandum) at 14-16.

[3] In its papers, Springfield does not take issue with these factual findings.

for counseling and for implementation of a behavior plan. The proposed February 2007 – February 2008 IEP was accepted in May 2007. (P-2; S-7; S-8; see also P-10) The plan was implemented at the Kennedy Middle School during the remainder of the 2006-2007 school year. The Plan continued to be in effect when Quetzal transitioned to High school for 9th grade in the 2007-2008 school year.

     3.    Quetzal reached the age of 16 in August 2007. (P-2)

     4.    Quetzal moved out of Springfield in January 2008. He enrolled in an adjoining school district on January 14, 2008. (S-10)

     5.    Between the beginning of Springfield's school year in September 2007 and his move out of Springfield in January 2008, Quetzal missed 33 days of school. (P-3; S-2; S-12) Quetzal's special education Team did not reconvene as a result of these absences. Springfield took no other independent action to address Quetzal's absenteeism. (P-9)

     6.    Between September 2007 and January 2008, Quetzal received supervision and services from time to time from the Department of Social Services[4] and the Department of Youth Services. (S-1)

     7.    The special education placement and services offered to Quetzal, and accepted by his guardian, remained available to Quetzal throughout the life of the 2007-2008 IEP and specifically between September 2007 and January 2008. (S-1)

     8.    The Educational Surrogate Parent requested a Team meeting on November 30, 2007. The Team reconvened on December 20, 2007. It developed a new Individualized Education Plan for Quetzal calling for his placement in a partial inclusion

---

[4] The Department of Social Services was renamed the Department of Families and Children in July 2008. See G.L. c. 18B, § 1, as amended by St. 2008, c. 176, § 26; G.L. c. 6A, § 16, as amended by St. 2008, c. 176, § 14

social/emotional/behavioral support program within the regular high school.  (S-12, P-2)

9.      The Springfield Public Schools High School attendance policy provides that after four days of absence in a marking period no credit will be awarded for an affected course.  It further states that:

> any student who accumulates 13 or more absences during the academic year will be ineligible to move successfully from one grade to the next unless there are valid extenuating circumstances and a successful appeal.

(P-9)  The policy further sets out specific actions to be taken by the attendance officer and the building principal including phone contacts, investigations and referrals to attendance support and enforcement agents.

10.     There is no indication in this record that Susan Carplunk, the Educational Team Liaison listed on Quetzal's accepted IEP, contacted the Student or his guardian to determine why he did not attend school in the fall of 2007. There is no indication in this record of any contact by any high school administrative staff, counselors, special education teachers, attendance officers, or other public school personnel, with Quetzal or his guardian during the fall of 2007.

11.     Springfield generated official records of Quetzal's attendance during the fall of 2007.  (P-3;   )  These records show that Quetzal had missed four days of at least one period of class by September 19, 2007.  The record also shows that Quetzal had accumulated 13 full days marked "TRU" by October 24, 2007.  There are no report cards, progress notes, or other teacher generated reports in the record.

### III.  ARGUMENT

**A.    THE HEARING OFFICER DID NOT ERR IN CONCLUDING THAT FAPE WAS DENIED.**

The BSEA Hearing Officer did not err in concluding that Quetzal Doe's repeated absences obligated Springfield to take affirmative action and that Springfield's failure to take

any action to address Quetzal's absenteeism resulted in a denial of a free, appropriate public education ("FAPE").

Under the facts of this case, it was "necessary" under state regulations (or "warrant[ed]" under similar federal regulations) to reconvene the Team. 603 C.M.R. § 28.04(3); 34 C.F.R. § 300.303(a)(1). While the term 'necessary" is not defined in the regulations, the Hearing Officer concluded that it means essential or needed to achieve a certain result or effect and that this meaning must be considered then in the context of Springfield's ongoing responsibility to ensure that Quetzal was receiving a free, appropriate public education. At a minimum, Springfield had a continuing obligation to ensure that the IEP it had developed for Quetzal, and which was accepted, was being implemented. 20 U.S.C. §1412(a)(1)(A), 34 CFR §300.101(a). Here, the Hearing Officer determined that it was reasonable to expect an active response to a pattern of absences as "essential" to or "needed to achieve" Springfield's overall obligation to provide FAPE to Quetzal.

There are useful statutory and regulatory analogies to provide guidance. For example, the Massachusetts compulsory school attendance law, G.L. c. 76, § 18[5], applicable to all

---

[5]     The statute provide, in relevant part, that

No student sixteen years of age or older shall be considered to have permanently left public school unless an administrator of the school which such student last attended has sent notice within a period of ten days from the student's fifteenth consecutive absence to the parent or guardian of such student in both the primary language of such parent or guardian and English, stating that such student and his parent or guardian may meet with the school committee or its designated representatives prior to the student permanently leaving school, within ten days after the sending of the notice. The time for meeting may be extended at the request of the parent or guardian and with consent of the school committee or its designated representatives, provided no extension shall be for longer than fourteen days. Such meeting shall be for the purpose of discussing the reasons for the student permanently leaving school and alternative educational or other placements.

students, including those with disabilities, obliges a public school to undertake action in response to absenteeism of more than fifteen days. The Legislature considers 15 absences sufficient to indicate a potential impairment of a student's education and to trigger heightened level of scrutiny from the school.

Springfield's own official attendance policy states that students absent from a course for four or more days during a marking period will not receive credit for the course, and students who accumulate more than 13 absences throughout the school year will not be promoted to the next grade. R. 2 at 276. Springfield's attendance policy is consistent with the Commonwealth school attendance statute. Indeed it reduces the number of allowable absences to 13, indicating Springfield's determination that no student, with or without disabilities, can make effective educational progress if absent from school for more than 13 days.

While neither the statute nor the attendance policy specifically addresses the responsibilities of the school district when the chronically absent student has an approved IEP, they do set out a timeframe, 4 to 15 school days, within which it may reasonably be expected that any student will suffer some degree of educational deprivation.

There is no indication in the record that the school district took any of the actions contemplated by the statute or its own attendance policy despite contemporaneous school records showing that Quetzal was absent for more than four days in one quarter and remained absent for more than 15 (and hence more than 13) consecutive days in the fall, 2007.

Federal special education regulations do not directly address a school's duty to examine a student's chronic absenteeism. They do, however, set out some circumstances in which it is "necessary" or "warranted" for a school to act, supervise, and provide alternate educational services to an absent student with disabilities. 20 U.S.C. §1415(k); 34 C.F.R. §300.530

(establishing ten day maximum period for exclusion from an agreed upon special education program for disciplinary reasons before the student's Team must reconvene to consider amendments to the student's current IEP or to develop an alternate educational placement); see also 603 C.M.R. § 28.04(3)(c) (requiring school district to provide educational services to a student who has been out of school for more than 14 days at the direction of physician). There appears to be a general consensus that absence from school for a period of time in the 10 to 15 day range creates a presumption that a student is not making effective educational progress and requires a school to take some sort of affirmative action in response.

Springfield had a continuing duty to Quetzal in particular as the first goal on his IEP, which concerned his social-emotional needs, to improve "the handling of school responsibilities." R. 2 at 239. Certainly the most basic school responsibility for a student is attendance. Without ensuring Quetzal's attendance, Springfield could not ensure implementation of his IEP and the delivery of a free, appropriate public education to him.

Springfield claims that there is "no legal basis" for requiring a special education Team to convene when a student is truant from school. Dkt. No. 24 at 6, 8. While no special education regulation may explicitly require the Team to reconvene to consider a student's truancy, Springfield was under a continuing duty under the IDEA to ensure Quetzal's receipt of FAPE. See also Dkt. No. 24-5 (*Ronald v. Springfield Public School*, BSEA # 08-3061) at 8 (acknowledging correctness of Springfield's statement that no special education regulation explicitly requires the Team to reconvene to consider a student's truancy, but determining that Springfield is under obligation to ensure the receipt of FAPE and so must take some sort of responsive action when an IDEA-eligible student is chronically absent from school).

Springfield states that Quetzal "has not been identified as a student with an emotional disability for whom lack of attendance might be viewed as an effect of that disability. Without this nexus, the school district was not responsible for addressing the truancy through the IEP/special education process." Dkt. No. 24 at 11. This assertion must be considered in light of Springfield's response to Quetzal's request for a hearing. Springfield stated that it "recognized that, as a special education student, the Team needs to consider whether the school truancy is related to the disability and if it is, address it through the IEP. In [Quetzal's][6] case, *his IEP does reflect consideration of his school truancy*, both in the Vision Statement and in the goals and objectives as well as through the direct services (counseling) and placement in a substantially separate classroom." R. 1 at 60.[7]

### B.  THE HEARING OFFICER DID NOT ERR IN ORDERING COMPENSATORY SERVICES.

The Hearing Officer also did not err in ordering compensatory services as a result of this denial of FAPE. *In re: Ronald and the Springfield Pubic Schools* (Dkt. No. 24-5), which Springfield cites, actually bolsters, rather than detracts from, the decision under review here. Like Quetzal, Ronald was a chronically absent student enrolled in the Springfield Public Schools. Both matters were decided by Hearing Officer Byrne in June 2008. However, on the basis of the record established in *Ronald*, the Hearing Officer concluded that Springfield met its ongoing obligation to ensure the receipt of FAPE and therefore awarded no compensatory services. Unlike its failure to address or even acknowledge Quetzal's chronic absenteeism, Springfield actively responded to Ronald's habitual absenteeism. Springfield convened four

---

[6] Psydonm substituted for student's first name.

[7] Later, when the IEP was modified, Springfield stated that a "Behavioral Intervention Plan was developed specifically to address the attendance issue." R. 1 at 148, 185, 188; Dkt. No. 1 (complaint), ¶ 10.

8

Team meetings in the course of one calendar year, in response to Ronald's truancy. Dkt. No. 24-5 at 9 of 13. Each meeting discussed in and out of school options to promote regular school attendance, and proposed increasing levels of school-based interventions and therapeutic support. Dkt. No. 24-5 at 9-10 of 13. The Hearing Officer found that Springfield's actions "were appropriately responsive to the Student's special education needs, and met Springfield's ongoing procedural and substantive obligation to ensure the delivery of a free, appropriate public education to Ronald." Dkt. No. 24-5 at 10 of 13. It took the "necessary" procedural steps "warranted" by Ronald's chronic absences. Dkt. No. 24-5 at 11 of 13.

Similarly, in *Student v. Springfield Public Schools* (Dkt. No. 24-4), which Springfield also cites, Springfield actively responded to Student's habitual absenteeism, unlike its failure to address or even acknowledge Quetzal's chronic absenteeism. Members of the student's Team met multiple times throughout the 2006-07 school year to address the student's absenteeism. Dkt. No. 24-4 at 24 of 31. Springfield took steps to involve the Parent in Student's education and to work with the family to address Student's needs and absenteeism. Dkt. No. 24-4 at 26 of 31. Indeed, the Hearing Officer found that the Springfield Public Schools' Attendance Specialist's "persistence and tenacity in engaging Student and Parent in Student's education was admirable." Dkt. No. 24-4 at 2, 26. She found that "[g]iven the specific circumstances of this case, Springfield met its substantive and procedural obligations toward Student regarding truancy by calling Parent on the phone, visiting Parent's home more than once, meeting in school,

contacting [Department of Families and Children], and filing §51As[8] and a CHINS petition[9]." Dkt. No. 24-4 at 26.

      Contrary to Springfield's suggestion, the Hearing Officer did not hold the school district strictly liable here for Quetzal's failure to attend school. Rather, the Hearing Officer awarded compensatory services because of Springfield's failure to meet its obligation to ensure the receipt of FAPE by Quetzal. Special education law presumes ill effects from lack of appropriate programming for more than ten days and Quetzal was absent more than thirty-three days. She awarded compensatory services consistent with those offered by Springfield to Quetzal to resolve the case.[10]

---

[8]    This refers to reports that are required to be made to the Department of Children and Families by certain professional persons, including public school teachers and educational administrators, who have reasonable cause to believe that a child under the age of eighteen years is suffering physical or emotional injury resulting from abuse inflicted upon him which causes harm or substantial risk of harm to the child's health or welfare including sexual abuse, or from neglect. G.L. c. 119, § 51A.

[9]    This refers to petitions that may be filed in the Massachusetts Juvenile Court seeking a determination that a child is in need of services. G.L. c. 119, § 39E. A child in need of services was defined as a child below the age of seventeen who persistently runs away from the home of his parents or legal guardian, or persistently refuses to obey the lawful and reasonable commands of his parents or legal guardian, thereby resulting in said parent's or guardian's inability to adequately care for and protect said child, or a child between the ages of six and sixteen who persistently and wilfully fails to attend school or persistently violates the lawful and reasonable regulations of his school. G.L. c. 119, § 21. Thus definition was amended effective July 2008. St. 2008, c. 176, § 83; St. 2008, c. 215, § 63.

[10]    Although Springfield characterizes its settlement offer to Quetzal as "confidential," Dkt. No. 24 at 12-13, it was not intended for or restricted to Quetzal only. Springfield itself quickly sent it to the Hearing Officer and did so without limitation. R. 2 at 286, 288, 324-25.

## IV. **CONCLUSION**

For the foregoing reasons, the state defendants respectfully request that their cross-motion for summary judgment be allowed, Springfield's cross-motion for summary judgment be denied, and final judgment be entered in the state defendants' favor, affirming the decision under review.

By their attorney,

MARTHA COAKLEY
ATTORNEY GENERAL

By:  */s/ James S. Whitcomb*_____
James S. Whitcomb
Assistant Attorney General
Western Massachusetts Division
1350 Main Street
Springfield, MA  01103-1629
(413) 784-1240, ext. 113 (telephone no.)
(413) 784-1244 (facsimile no.)

DATED:  December  31, 2008.          B.B.O. No. 557768

## **CERTIFICATE OF SERVICE**

I, James S. Whitcomb, Assistant Attorney General, hereby certify that this document, filed through the Electronic Case Files system, will be, on this 31st day of December, 2008, sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing and mailed in paper copy form, by first class mail, postage prepaid, to those indicated non-registered participant(s).

*/s/ James S. Whitcomb*_____
James S. Whitcomb