UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| SPRINGFIELD SCHOOL COMMITTEE, | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.  08-30132-MAP |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| QUETZAL DOE, BY AND THROUGH HIS | ) | |
| EDUCATIONAL SURROGATE PARENT | ) | |
| BRYAN CLAUSON, ESQ., THE | ) | |
| MASSACHUSETTS DEPARTMENT OF | ) | |
| ELEMENTARY AND SECONDARY | ) | |
| EDUCATION and the BUREAU OF SPECIAL | ) | |
| EDUCATION APPEALS, | ) | |
| Defendants | ) | |


REPORT AND RECOMMENDATION WITH REGARD TO THE PARTIES'
CROSS-MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 15, 25, and 28)
May 11, 2009

NEIMAN, U.S.M.J.

        This case, brought by the Springfield School Committee ("Plaintiff"), follows a

June 4, 2008 decision by a hearing officer of the Bureau of Special Education Appeals

of the Massachusetts Department of Education ("BSEA").  In a two-count complaint,

Plaintiff has sued both a student with the pseudonym "Quetzal Doe" ("Quetzal") and the

BSEA (together "Defendants").[1]  In essence, Plaintiff alleges that the hearing officer's

decision violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §

_____

        [1]  Technically, both the BSEA and the Massachusetts Department of Elementary
and Secondary Education have been sued, but for convenience's sake, and following
the parties' lead, the court will simply refer to these state defendants as the BSEA.

1400 *et seq.*, and parallel state law.  As a counter-claimant, Quetzal alleges that he is a prevailing party and, hence, entitled to an award of attorney's fees.

Soon after the pleadings were joined, Quetzal moved for summary judgment and Plaintiff filed a cross-motion for summary judgment.  In turn, the BSEA compiled and filed the two-volume administrative record as well as its own cross-motion for summary judgment.  All three motions have been referred to this court for a report and recommendation.  *See* 28 U.S.C. § 636(b)(1)(B).

Although the file is extensive, the two legal issues raised by the parties are relatively precise, namely, (1) whether Plaintiff has carried its burden of showing that the hearing officer's decision ought to be overturned and (2) whether Quetzal is entitled to attorney's fees.  Although the court questions whether this matter truly presents a case or controversy, it believes that the answer to the first question is no and that the answer to the second question is yes as to fees earned before this court, but not otherwise.

## I. Background

The following background comes verbatim from the undisputed findings of fact in the hearing officer's June 4, 2008 decision (hereinafter "Decision").[2]  *See Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993) (noting that in the usual course, the court's facts are taken from the administrative record); *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 52 (1st Cir. 1992) (noting that "the court must recognize

---

[2]  A copy of the Decision is located at pages 203-14 of Document No. 19, the Administrative Record Documents Volume I (hereinafter "A.R. Vol. I"); the hearing officer's findings of fact (hereinafter "Decision Facts") are located at pages 204-07.

the expertise of" the hearing officer "and consider carefully administrative findings")

(citations and internal quotation marks omitted).

1.      Quetzal was initially found eligible for special education on February 13, 2008, when he was in the 8th grade.  A psychological evaluation conducted by the Springfield Public Schools found Quetzal to have impaired cognitive functioning.  Teacher reports highlighted Quetzal's difficulties with attention, concentration, lack of background information, and overall poor academic skills.  The Team noted that Quetzal demonstrated significant and persistent behavioral and discipline issues.  He was inappropriate and disruptive in all school settings.  He also had a history of poor school attendance.

2.      The Team developed an IEP ["Individualized Education Program"] calling for Quetzal to receive intensive, specialized instruction in math and English language, as well as academic support, in a substantially separate classroom program.  It also provided for special education assistance in all other school settings; for counseling and for implementation of a behavior plan.  The proposed February 2007 - February 2008 IEP was accepted in May, 2007.  The plan was implemented at the Kennedy Middle School during the remainder of the 2006-2007 school year.  The Plan continued to be in effect when Quetzal transitioned to high school for 9th grade in the 2007-2008 school year.

3.      Quetzal reached the age of 16 in August of 2007.

4.      Quetzal moved out of Springfield in January 2008.  He enrolled in an adjoining school district on January 14, 2008.

5.      Between the beginning of Springfield's school year in September 2007 and his move out of Springfield in January 2008, Quetzal missed 33 days of school.  Quetzal's special education team did not reconvene as a result of these absences.  Springfield took no other independent action to address Quetzal's absenteeism.

6.      Between September 2007 and January 2008, Quetzal

3

received supervision and services from time to time from the Department of Social Services and the Department of Youth Services.

7.      The special education placement and services offered to Quetzal, and accepted by his guardian, remained available to Quetzal throughout the life of the 2007-2008 IEP and specifically between September 2007 and January 2008.

8.      The Educational Surrogate Parent requested a Team meeting on November 30, 2007.  The Team reconvened on December 20, 2007.  It developed a new Individualized Education Plan for Quetzal calling for his placement in a partial inclusion social/emotional/behavioral support program within the regular high school.

9.      The Springfield Public Schools High School attendance policy provides that after four days of absence in a marking period no credit will be awarded for an affected course.  It further states that:

> any student who accumulates 13 or more absences during the academic year will be ineligible to move successfully from one grade to the next unless there are valid extenuating circumstances and a successful appeal.

The policy further sets out specific actions to be taken by the attendance officer and the building principal including phone contacts, investigations and referrals to attendance support and enforcement agents.

10.     There is no indication in this record that Susan Carplunk, the Educational Team Liaison listed on Quetzal's accepted IEP, contacted the Student or his guardian to determine why he did not attend school in the fall of 2007. There is no indication in his record of any contact by any high school administrative staff, counselors, special education teachers, attendance officers, or other public school personnel, with Quetzal or his guardian during the fall of 2007.

4

      11.    Springfield generated official records of Quetzal's attendance during the fall of 2007.  These records show that Quetzal had missed four days of at least one period of class by September 19, 2007.   The record also shows that Quetzal had accumulated 13 full days marked "TRU" by October 24, 2007.  There are no report cards, progress notes, or other teacher generated reports in the record.

(A.R. Vol. I at 204-07.)

There are several other facts reflected in the record which the court believes round out the picture and provide more context for the parties' dispute.  First, as noted in the hearing officer's recitation, the instant matter concerns actions taken on Quetzal's behalf by an Educational Surrogate Parent ("ESP"), Bryan Clauson, who is also acting as Quetzal's attorney here; Mr. Clauson was appointed by Associate Justice Judith A. Locke of the Hampden County Juvenile Court on November 2, 2007, as "Guardian ad Litem/Next Friend to serve additionally as Educational Surrogate Parent on behalf of [Quetzal] . . . with the authority to sign educational plans and make educational decisions"  (*Id.* at 9.)

Second, on December 6, 2007, at about the same time that the ESP requested a Team meeting, he also requested an expedited hearing before the BSEA.  (*Id.* at 1-8.) The ESP sought four forms of relief against Plaintiff, only two of which had some continued viability by the time the hearing was held:

      1.    to immediately conduct a Team Meeting to determine whether [Quetzal]'s poor attendance and/or behaviors and resulting lack of effective progress are related to his disability; [and]

    . . . .

     4.      to provide appropriate educational compensatory services and reimburse the [ESP] for any expenses and attorney fees.

(*Id.* at 6.)  The ESP's two other requests for relief concerned possible referrals and placements, both of which became moot once Quetzal moved out of the school district on January 4, 2008.  (See *id.*)[3]

After some preliminary delays, the hearing officer, with the parties' consent, canceled the hearing scheduled for March 25, 2008, and ruled on the matter based on the documents and briefs submitted.  The hearing officer's decision, issued on June 4, 2008, concluded as follows:

> In order to ensure appropriate implementation of his 2007-2008, [Plaintiff] had an affirmative duty to respond to Quetzal's chronic absenteeism during the fall of 2007.  Its failure to do so in a timely manner resulted in the denial of a free, appropriate public education to Quetzal during the fall of 2007.

(*Id.* at 214.)  As relief, the hearing officer ordered Plaintiff to provide at least twenty-three days of special education services to Quetzal during the summer of 2008.  (*Id.*) As it turns out, that is essentially what Plaintiff had previously offered Quetzal on March 14, 2008, to resolve the entire matter.  (Document No. 24 ("Pl.'s Brief"), Ex. 5.)

## II. Summary Judgment Standards

"Summary judgment is warranted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[3]   The ESP also sought various forms of "declaratory relief" (*id.* at 6-7) but has since acknowledged that the hearing officer has no such power.

a judgment as a matter of law.'" *Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d

33, 41 (1st Cir. 2005) (quoting Fed. R. Civ. Pro. 56(c). Cross-motions for summary

judgment, used here as a vehicle for resolving an IDEA-based dispute, *see Norton Sch.

Comm. v. Mass. Dep't of Educ.*, 768 F. Supp. 900, 904 (D. Mass. 1991), do not alter

the basic summary judgment standard, but require the court to determine whether

either party deserves judgment as a matter of law on facts that are not disputed. *Adria

Int'l Group, Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

III. DISCUSSION

As noted, there are three motions for summary judgment before the court. After

first outlining the standard of review and the parties' positions, the court will raise its

concerns about the justiciability of this action, analyze the parties' respective

arguments and, lastly, address the question of attorney's fees.

A. Standard of Review

In an action brought under the IDEA, the court "(i) shall receive the records of

the administrative proceedings; (ii) shall hear additional evidence at the request of a

party; and (iii) basing its decision on the preponderance of the evidence, shall grant

such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c). The

court does not, however, have "an invitation . . . to substitute [its] own notions of sound

educational policy for those of the school authorities which [it] review[s]." *Board of

Education v. Rowley*, 458 U.S. 176, 206 (1982). Rather, the court must give the state

administrative proceeding "due weight." *Id. Accord Lenn*, 998 F.2d at 1087.

To accomplish its task, the court must apply "an intermediate standard of

7

review[,] . . . a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency's determination than clear-error review entails, but which, nonetheless, falls well short of complete *de novo* review." *Lenn*, 998 F.2d at 1086 (citation omitted).  *See also Ross v. Framingham Sch. Comm.*, 44 F. Supp. 2d 104, 111 (D. Mass. 1999) (noting First Circuit's caution that reviewing courts must not "turn a blind eye to administrative findings or . . . discard them without reason") (citation and internal quotation marks omitted), *aff'd without opinion*, 229 F.3d 1133 (1st Cir. 2000).  This standard must be applied against the traditional summary judgment standard. *Norton*, 768 F. Supp. at 904.

B.  The Parties' Positions

In its motion for summary judgment, Plaintiff argues that the hearing officer, incorrectly and in contradiction of applicable law, found that Plaintiff failed to provide Quetzal with a free, appropriate public education (hereafter "FAPE") in light of Quetzal's truancy.  Plaintiff also argues that compensatory services were improperly awarded because Quetzal failed to meet his burden of proving that he suffered educational harm as a result of Plaintiff's actions.

For its part, the BSEA argues that the hearing officer did not err when concluding that Quetzal's repeated absences obligated Plaintiff to take affirmative action and that Plaintiff's failure to do so resulted in a denial of a FAPE.  The BSEA also argues that the hearing officer did not err when ordering compensatory services.

Quetzal's arguments in support of his motion for summary judgment mirror those of the BSEA.  Quetzal also requests attorney's fees as a prevailing party.  Plaintiff, as

might be expected, opposes that request.

C. Case or Controversy

As mentioned, the court questions whether the instant action -- the very type of case in which justiciability issues often arise -- truly presents a case or controversy. *See* Charles Alan Wright and Mary Kay Kane, 20 Fed. Prac. & Proc. § 13 ("The main body of law on 'case or controversy' comes from . . . cases seeking judicial review of administrative action."). To be sure, the parties believe that a controversy exists and have exerted significant effort before this forum in that regard. Nonetheless, a close examination of the substantive issues leaves this court with doubt.

As the First Circuit has explained, citing Article III of the United States Constitution, "[i]t is black-letter law that, in a federal court, justiciability requires the existence of an actual case or controversy." *Maine Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R.*, 321 F.3d 9, 17 (1st Cir. 2003). Moreover, Article III's "case-or-controversy requirement subsists through all stages" of the litigation. *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1988). In the instant case, however, neither one of the issues addressed by the hearing officer appears to have any continued viability.

First, there is no real controversy concerning compensatory education, the presence of which might otherwise prevent this case from being deemed moot. *See Maine Sch. Admin. Dist. No 35*, 321 F.3d at 18 ("The presence of an actionable claim for compensatory education will insulate an IDEA case against a mootness challenge even after the child's eligibility for special education services ends.") (citing cases). As the record makes clear, the question of compensatory services had fallen by the

wayside by the time this matter reached court.[4]   Granted, Plaintiff argues before this

court that the compensatory program ordered by the hearing officer was inappropriate

because Quetzal failed to prove that he suffered educational harm as a result of

Plaintiff's actions.  But the compensatory relief ordered -- twenty-three days of special

education during the summer of 2008 -- was the very proposal made by Plaintiff to

resolve the case, a proposal, by the way, which informs Plaintiff's opposition to

Quetzal's request for attorney's fees.

Second, the issue of "reconvening" a Team meeting in light of Quetzal's truancy

is, in the court's opinion, theoretical.  Although the parties seem intent on obtaining the

views of the court in this regard -- perhaps to guide Plaintiff and Quetzal's advocate in

future cases -- a judicial resolution of the underlying issue by the court would neither

alter the relationship between the parties nor have any practical effect on Quetzal

himself.  *See Thomas R.W. v. Mass. Dep't of Educ.,*130 F.3d 477, 479 (1st Cir. 1997)

("A case becomes moot when the issues presented are no longer live or the parties

lack a legally cognizable interest in the outcome, or alternatively, when the party

invoking federal court jurisdiction no longer has a personal stake in the outcome of the

controversy.") (citation and internal quotation marks omitted).  Quetzel is no longer in

Plaintiff's school system, he has (assumedly) been provided the compensatory

education ordered by the hearing officer, and there is nothing to indicate that Plaintiff is

seeking reimbursement for any compensatory education provided.

---

[4]  There were some minor disputes about the implementation of the
compensatory program, but those were resolved by the parties prior to the
commencement of this suit.  (See A.R. Vol. I at 217-31.)

There is, of course, an exception to mootness for issues "capable of repetition, yet evading review," *Roe v. Wade*, 410 U.S. 113, 125 (1973), and, on occasion, IEP claims have been found to fit within those parameters, *see Honig v. Doe*, 484 U.S. 305, 318 (1988).  As might be expected, however, this "applies only in exceptional situations," *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983), and the court doubts that the parties, if required, could demonstrate that "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again," *Pallazola v. Rucker*, 797 F.2d 1116, 1129 (1st Cir. 1986) (citation, internal quotation marks and emphasis omitted).  In the court's opinion, there is little likelihood, given the unique confluence of events, that Plaintiff and Quetzal will have occasion in the future to dispute whether his Team ought to be reconvened.

To be sure, the First Circuit has suggested that IEP disputes often satisfy the first requirement for the exception to apply.  *See Rome Sch. Comm. v. Mrs. B.*, 247 F.3d 29, 31 (1st Cir. 2001) (noting that IEP controversies "are likely to evade review because the administrative and judicial review of an IEP is ponderous and usually will not be complete until a year after the IEP has expired") (citations and internal quotation marks omitted).  With respect to the second requirement, however, the court doubts that "there is a reasonable likelihood that [Quetzal] will again suffer the deprivation," *Honig*, 484 U.S. at 317, if deprivation it was, that led to his seeking a hearing before the BSEA.  The mere fact that Plaintiff bristles at the hearing officer's analysis regarding the reconvening of the Team is not enough, in the court's opinion, to create a case or

11

controversy.  *See Public Serv. Corp. of New Hampshire v. Consolidated Utilities & Communications, Inc.*, 846 F.2d 803, 807 (1st Cir. 1988) ("Article III . . . prevents us from 'clarifying' even very important legal questions absent a case or controversy.") (quoting *Honig*, 484 U.S. 305).

Despite these misgivings, the court, for three reasons, will address the substance of the parties' cross-motions.  First, the court has an obligation to provide as complete a report and recommendation as possible.  Second, the parties have not briefed the "case or controversy" issue -- raised by the court for the first time at oral argument -- and the court believes it best to move toward resolution of the entire matter without further delay.  Third, the court, in any event, will need to consider the substantive issues insofar as they relate to the question of attorney's fees, *i.e.*, whether Quetzal has  prevailed administratively and/or judicially.  *See Maine Sch. Admin. Dist. No. 35*, 321 F.3d at 15 ("[A] court faced with the need to decide whether a litigant is (or is not) a prevailing party must make a qualitative inquiry into the import of the result obtained.").  *See also Christopher P. v. Marcus,* 915 F.2d 794, 804 (2d. Cir. 1990) ("[I]t is helpful to identify the relief sought by the plaintiff and compare it with the relief obtained as a result of the suit.").  Accordingly, the court will proceed to its analysis.

D.  Analysis of Substantive Arguments

Analyzing the parties' motion has proven complicated given the breadth of their arguments.  In the end, however, the court will conclude that Plaintiff has not carried its burden of proving that the hearing officer's decision should be overturned, even though the court disagrees with some of the hearing officer's reasoning.

The heart of Quetzal's appeal to the BSEA was his contention of having been denied a FAPE because of Plaintiff's failure "to properly and timely convene a Team meeting to address [his] poor attendance and lack of effective progress entitling [him] to compensatory education."  (A.R. Vol. I at 77.)  For the most part, Quetzal won that argument before the BSEA.  Now, in light of Plaintiff's appeal to this court, Quetzal argues, and the BSEA agrees, that it was reasonable for the hearing officer to deem an active response to Quetzal's truancy by Plaintiff to be "necessary" in accord with state law.  Moreover, Quetzal and the BSEA argue that the hearing officer, when determining what was "necessary," made useful statutory and regulatory analogies, including consideration of Plaintiff's attendance policy.

For its part, Plaintiff asserts to this court that, as the hearing officer herself recognized, "there has been no explicit statutory or regulatory directive establishing the responsibility of the district when a student who is eligible or potentially eligible for special education is chronically absent from school."  (*Id.* at 208.)  According to Plaintiff, the hearing officer should have stopped there and not have sought indirect support for her conclusion -- that the school district had denied Quetzal a FAPE -- from either the state's compulsory school attendance law or Plaintiff's attendance policy.  In addition, Plaintiff asserts, as the hearing officer also recognized, that "this record lacks a particularized showing of lack of progress or loss of education benefit attributable to [Plaintiff]'s failure to respond to Quetzal's absenteeism."  (*Id.* at 213.)  That finding, in Plaintiff's view, should have ended the matter.

There is in fact some confusion as to just what the hearing officer decided.  At

the beginning of her decision, the hearing officer described the two issues before her

as follows:  "Whether [Quetzal]'s repeated absences during the 2007-2008 school year

obligated [Plaintiff] to reconvene [Quetzal]'s Special Education Team?"; and "If so,

whether the failure to reconvene the Team resulted in the denial of a free, appropriate

public education to [Quetzal]?"  (*Id.* at 204.)  Later in her opinion, however, the hearing

officer restated the issue as follows:  "Resolution of this matter turns on the answer to

one simple question: does a school district have an affirmative duty to reconvene a

special education team when a student with disabilities over the age of compulsory

school attendance is absent from school without a valid excuse?"  (*Id.* at 207.)

Despite this emphasis on "reconvening" a Team, however, the hearing officer

analyzed Plaintiff's potential obligation in significantly less specific language, namely,

whether Plaintiff needed to make an "active response" or take "some sort of affirmative

action" in the face of Quetzal's truancy.  (*Id.* at 209, 212.)  Indeed, it was this more

general language, not the obligation to reconvene the Team, that was reflected in the

hearing officer's conclusion, quoted above but repeated here as well:

> In order to ensure appropriate implementation of his 2007-
> 2008, [Plaintiff] had an affirmative duty to respond to
> Quetzal's chronic absenteeism during the fall of 2007.  Its
> failure to do so in a timely manner resulted in the denial of a
> free, appropriate public education to Quetzal during the fall
> of 2007.

(*Id.* at 214.)  Thus, the parties' assumptions perhaps to the contrary, the hearing officer

did *not* find that Plaintiff had to reconvene a Team meeting.  Although there are

intimations to that effect in her decision, the better reading of her decision is that once

Quetzal's truancy became excessive, as it did here, Plaintiff had an affirmative duty to take some sort of responsive action.  As the hearing officer explained, "[r]econvening [Quetzal]'s Team [was] one way, though not necessarily the only way, to fulfill [Plaintiff]'s ongoing responsibility to provide [a] FAPE to a chronically absent disabled student over the age of compulsory school attendance." (*Id.* at 213.)  With that understanding, the court believes, based on a preponderance of the evidence, that the hearing officer's ruling -- as reflected in her conclusion -- ought to be affirmed.

This is not to say that there are not significant flaws in the hearing officer's analysis.  For example, the hearing officer's exposition of the regulatory mandate is not quite accurate.  Citing 603 C.M.R. § 28.04(3), she stated that a Team must "be reconvened at the request of any Team member, at least annually, or sooner 'if necessary,'" (*id.* at 208), but the cited regulation reads quite differently:

> Annual Review and Three-year Reevaluations.  The school
> district shall review the IEPs and the progress of each
> eligible student at least annually.  Additionally, every three
> years, or sooner if necessary, the school district shall, with
> parental consent, conduct a full three-year reevaluation
> consistent with the requirements of federal law.

603 C.M.R. § 28.04(3) (2009).  As is obvious, the "if necessary" language -- which was the centerpiece of the hearing officer's analysis -- applies not to annual IEP reviews, but rather *full* three-year reevaluations.  This is by no means a quibbling difference when understood in light of the hearing officer's consideration of imposing an obligation on the part of Plaintiff to reconvene a Team meeting sooner than one year.

Similarly, the various attendance policies to which the hearing officer refers have

15

little relationship to IEPs or to the circumstances of this case.  Most glaringly, the hearing officer relied on a prior state regulation (603 C.M.R. § 310), which required a referral for a special education evaluation, that was no longer in effect as of January 2001, long before the events now at issue.  Equally unrelated is Plaintiff's attendance policy which the hearing officer also cited; at best, that policy requires that no credit be given for a course after four days of absence in a marking period, or, with thirteen or more absences, ineligibility for promotion absent extenuating circumstances.  Likewise, the Massachusetts Compulsory School Attendance law, Mass. Gen. L., ch. 76, § 18, to which the hearing officer made reference, simply requires a school to send notices to the parents or guardian of a student sixteen years of age or older "within a period of ten days from the student's fifteenth consecutive absence" before that student can be considered to have permanently left public school.

Aside from the fact that there was no proof that Plaintiff failed to abide by any of these particular policies, the policies themselves do not relate directly to the issues in this case.  The same is true of the state regulation which requires a school to provide educational services to a student who has been out of school for more than fourteen days at the direction of a physician, 603 C.M.R. § 28.03(3)(c) (2009), as well as the federal regulation which establishes a ten-day maximum for exclusion from an agreed-upon educational program for disciplinary reasons, 34 C.F.R. § 300.530(b)(2009).  *See also* 20 U.S.C. § 1415(k).[5]

---

[5]  It should also be noted that, unlike the situation in *Honig*, the instant case does not involve the question of disciplining a disabled child with an IEP, which raises related but significantly different questions.  *See generally* Terry Jean Seligmann, *Not*

Granted, the hearing officer made reference to these various provisions in an effort to come to grips with the fact that neither state nor federal regulations directly address a school's duty to examine a student's chronic absenteeism in the context of his or her IEP.  In doing so, however, the hearing officer overstated the import of these provisions, particularly when she converted them into a "heightened duty" toward students with disabilities and, in turn, "presumed" that an absence of more than ten days triggers a school district's duty to determine how a truant student with an IEP is to continue to receive a FAPE.  (A.R. Vol. I at 212.)  The hearing officer's efforts may have been laudable, but imbuing the various provisions with such consequential obligations was, in the court's view, overreaching.

The hearing officer, however, was on firmer ground when she cited Quetzal's IEP itself, as it existed in the fall of 2007, as a reason for Plaintiff to have considered reconvening the Team.  As the hearing officer explained, one of the goals of Quetzal's IEP was to "improve" his handling of school responsibilities, a goal grounded in Quetzal's often being late and walking out of class, among other serious performance problems.  (*Id.*)  "Certainly," the hearing officer opined, "the most basic responsibility for a student is attendance."  (*Id.*)  The court agrees.  As the First Circuit has noted, "behavior management services fall within the scope of services a school district may be required to provide under the IDEA."  *Rome Sch. Comm.*, 247 F.3d at 32.  Indeed,

*as Simple as ABC: Disciplining Children with Disabilities Under the 1997 IDEA Amendments*, 42 Ariz. L. Rev. 77 (2000).  As the record indicates, Quetzal absented himself from the school; he was neither disciplined nor expelled during the time period in question.

as Plaintiff itself has acknowledged, a Team needs to consider whether school truancy

is related to a student's disability and, if it is, address it through the IEP.  (A.R. Vol. I at

60.)

The hearing officer also had regulatory justification for concluding that, given the

totality of circumstances, Plaintiff ought to have at least considered reconvening the

Team.  *See* 34 C.F.R. § 300.303.[6]  In essence, the hearing oficer found that, given the

circumstances surrounding Quetzal's truancy, a reevaluation of his IEP was warranted

in accord with subsection (a)(1) and that Plaintiff's failure to make that determination

denied Quetzal a FAPE.  In the court's opinion, the hearing officer had sufficient

---

[6]  That federal regulation reads as follows:

(a) *General*.  A public agency must ensure that a
reevaluation of each child with a disability is conducted in
accordance with §§ 300.304 through 300.311 --

(1) If the public agency determines that the
educational or related services needs, including
improved academic achievement and functional
performance, of the child warrant a reevaluation; or

(2) If the child's parent or teacher requests a reevaluation.

(b) *Limitation*.  A reevaluation conducted under paragraph (a) of this
section --

(1) May occur not more than once a year, unless the parent and
the public agency agree otherwise; and

(2) Must occur at least once every 3 years, unless the
parent and the public agency agree that a
reevaluation is unnecessary.

34 C.F.R. § 300.303 (2009).  *See also* 20 U.S.C. § 1414(a)(2).

evidence to reach this conclusion.

To be sure, as the record makes clear, Plaintiff did reconvene the Team as soon as Quetzal's ESP requested it in early December of 2007, about one month after he was appointed. This, of course, was the ESP's right under subparagraph (a)(2) of the federal regulation. The question before the hearing officer, therefore, was whether Plaintiff, in accord with subparagraph (a)(1), ought to have determined even sooner that a reevaluation of Quetzal's situation was warranted. Again, the court believes that the hearing officer's conclusion in this regard was well grounded. Quetzal had been truant three days prior to October 1, 2007, truant another nineteen days in October, and truant another ten days by November 20, 2007. (See A.R. Vol. II at 248.) Granted, for much of this time Quetzal may have been "on the run" from the Department of Social Services in whose custody he had been placed. (A.R. Vol. I at 154.) But whatever the particular circumstances, the extent of Quetzal's truancy was serious enough for the hearing officer to conclude that Plaintiff had an affirmative duty to respond to Quetzal's chronic absenteeism during the fall of 2007.

In recommending that the hearing officer's conclusion be upheld, albeit not all her reasoning, the court adds two related points. First, the court is not suggesting that there is a specific number of days, as the hearing officer herself opined, which triggers a school district's obligation to determine whether and how an absent student is to continue receiving a FAPE. Until there is more specific statutory or regulatory guidance, each student's case must turn on its own facts. Here, as described, there is little question that the length and frequency of Quetzal's truancy called for a further

19

action on Plaintiff's part.

Second, the fact that the instant record "lacks a particularized showing of lack of progress or loss of educational benefit attributable to [Plaintiff]'s failure to respond to Quetzal's absenteeism," as the hearing officer recognized and as Plaintiff emphasizes in seeking reversal (*id.*), is of little moment.  As indicated, Plaintiff's failure to respond to Quetzal's chronic truancy within the context of his IEP was reason enough for the hearing officer to conclude that he had been denied a FAPE.  For the hearing officer to have found otherwise in light of these factual predicates would only encourage school districts to ignore such problems in the hope that no lasting damage will ensue.[7]

In sum, the court will recommend -- with the caveats expressed -- that Plaintiff's motion for summary judgment, to the extent it seeks reversal of the hearing officer's decision, be denied and that the BSEA's and Quetzal's motions, to the extent they seek affirmance of the hearing officer's decision, be allowed.

E.  Attorney's Fees

The IDEA provides that "[i]n any action or proceeding brought under [20 U.S.C. § 1415], the court, in its discretion, may award reasonable attorneys' fees as part of the costs to a prevailing party who is the parent of a child with a disability."  20 U.S.C. § 1415(i)(3)(B)(I). *See generally Claudia C.B. v. Pioneer Valley Performing Arts Charter Sch.*, 539 F. Supp. 2d 474, 485-86 (D. Mass. 2008).  The First Circuit defines

---

[7]   The court notes that Mr. Clauson, Quetzal's attorney and ESP, recently filed a complaint on behalf of others seeking to enjoin  the City of Springfield and its chief compliance officer from "allowing . . . children to leave classes and the school building without permission from school authorities and/or parents, and without appropriate supervision."  *Ana Saez v. City of Springfield*, Civil Action No.  09-30037-MAP.

"prevailing party" in the IDEA context as follows:

> [A] prevailing party is any party who "succeed[s] on any
> significant issue . . . which achieves some of the benefits
> plaintiffs sought in bringing suit." *Hensley* [*v. Eckerhart*],
> 461 U.S. [424, 433 (1983)].  The party's success cannot be
> a hollow victory; it must materially alter the litigants' legal
> relationship by modifying one party's behavior in a way that
> directly benefits the other.  *Farrar v. Hobby*, 506 U.S. 103,
> 111-12 (1992).  Thus, the change effected must be material;
> a purely technical or *de minimis* victory cannot confer
> prevailing party status.  *Tex. State Teachers Ass'n v.
> Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989).

*Maine Sch. Admin. Dist. No. 35*, 321 F.3d at 14-15 (ellipsis, footnote and further

citations omitted).  *See also Smith v. Fitchburg Pub. Sch.*, 401 F.3d 16, 22 (1st Cir.

2005) (holding that "there must be 'judicial *imprimatur* on the change'" in the parties'

legal relationship before fees may be awarded) (quoting *Buckhannon Bd. & Care

Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001))*;

Antonio v. Boston Pub. Sch.*, 314 F. Supp. 2d 95, 98, 99 (D. Mass. 2004) ("Post-

*Buckhannon* case law continues to support the premise that a plaintiff can achieve

prevailing party status at an administrative level and therefore be entitled to attorneys'

fees and costs.") (citing cases).

Quetzal's argument in support of his request for fees is brief and goes as

follows:  Plaintiff is appealing the sole issue determined by the hearing office; Quetzal

won on that issue before the BSEA and should win here as well; *ergo*, Quetzal is a

prevailing party entitled to attorney's fees.  Unfortunately, Quetzal ignores a number of

important issues with regard to the question of attorney's fees, the combination of

which, in the court's opinion, would preclude such fees at least at the administrative

level.

First, attorney's fees are only available to a prevailing party "parent," 20 U.S.C. §

1415(i)(3)(B)(I), not necessarily a party who, like Mr. Clauson, is both an attorney and

an "educational surrogate parent."  As described, Mr. Clauson was appointed Quetzal's

Guardian ad Litem/Next Friend and ESP on November 2, 2007, by the Juvenile Court

"with the authority to sign educational plans and make educational decisions."  (A.R.

Vol. I at 9.)  The particular circumstances of that appointment have not been made

clear.  What is clear, however, is that Mr. Clauson was "authorized to bill the Trial Court

for no more than 10 hours pursuant to this appointment."  (*Id.*)  If additional services are

required," the appointment continues, "it is the responsibility of the Guardian ad Litem

to seek approval of additional time prior to the provisions of such services."  (*Id.*)

Although the court questions whether it was truly necessary for Mr. Clauson to file a

hearing request at the same time he requested that the Team be reconvened, his

efforts in this regard appear to fall well within his appointment.  Yet, despite the

authority granted him, Mr. Clauson, as confirmed at oral argument, simply chose not to

bill the Trial Court for his efforts before the BSEA or seek approval for the additional

time he expended.  More importantly for present purposes, he has not shown why this

court should instead award fees for those efforts under the IDEA.

Second, Plaintiff took steps to insulate itself from a claim of attorney's fees by

making its settlement offer to Quetzal -- summer school -- on March 14, 2008, eleven

days prior to the scheduled BSEA hearing on March 25, 2008.  Since the hearing

officer essentially adopted Plaintiff's good faith offer, Quetzal appears to be precluded

from seeking attorney's fee arising thereafter based on the following provision of the

IDEA.

> Attorney's fees may not be awarded and related costs may
> not be reimbursed in any action or proceeding under this
> section for services performed subsequent to the time of the
> written offer of settlement if (I) the offer is made within the
> time prescribed by Rule 68 of the Federal Rules of Civil
> Procedure or, in the case of an administrative proceeding, at
> any time more than 10 days before the proceeding begins;
> (II) the offer is not accepted within 10 days; and (III) the
> court or administrative hearing officer finds that the relief
> finally obtained by the parents is not more favorable to the
> parents than the offer of settlement.

20 U.S.C. § 1415(i)(3)(D)(i).  As described, the court does not believe that the relief

finally obtained was more favorable than the offer of settlement.

This combination of reasons to deny fees incurred at the administrative level,

however, does not resolve the question of attorney's fees incurred before this tribunal.

Although it is too soon to determine whether Quetzal in fact has prevailed here, the

court believes that, should its report and recommendation be adopted in its entirely,

Quetzal ought to receive attorney's fees for efforts expended by Mr. Clauson

responding successfully to Plaintiff's appeal.  Granted, given the court's concerns

about whether this matter truly presents a case or controversy, it has lingering doubt as

to whether resolution of this judicial matter in Quetzal's favor would "materially alter the

litigants' legal relationship" with one another.  *Maine Sch. Admin. Dist. No. 35*, 321 F.3d

at 15.  But Plaintiff has not pursued such a defense with respect to Quetzal's request

for attorney's fees.  If anything, Plaintiff, by instituting the litigation, obviously believes

that Quetzal's success before the BSEA was more than a "hollow victory," *see id.* at 14,

and his success in this forum, should the court's report and recommendation be adopted, would be no less so.

In addition, Plaintiff ought not expect that the Juvenile Court should foot the bill for Quetzal's having to respond to the suit Plaintiff initiated. *See id.* at 16 ("A triumphant defendant may qualify as a prevailing party for the purpose of obtaining a fee award.") (citing cases). Indeed, it could be argued that Plaintiff's appeal also undermines the applicability of 20 U.S.C. § 1415(i)(3)(D)(I), quoted above, to post-BSEA efforts on Quetzal's behalf. If the administrative relief Quetzal received was not more favorable to him than had been offered by way of settlement prior to the hearing officer's ruling, as Plaintiff suggests, there ought to have been no cause for Plaintiff to have appealed the matter any further.

For all these reasons, the court recommends that, should this report and recommendation be otherwise accepted, Quetzal should be awarded attorney's fees for efforts expended on his behalf in this forum, assuming of course that he provides contemporaneous and reasonable time records in support of his request.

## IV. CONCLUSION

For the reasons stated, the court recommends that Plaintiff's motion be denied, that the BSEA's motion be allowed and that Quetzal's motion be allowed with respect to the substantive issues but allowed in part only with respect to attorney's fees.[8]

---

[8]   The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically

DATED:   May 11, 2009

  /s/ Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge

_____

identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.